**FILED IN CHAMBERS**
**U.S.D.C ATLANTA**

Date: Mar 20 2026

**KEVIN P. WEIMER** , Clerk

By: s/ Neethu Varghese
Deputy Clerk

# United States District Court

NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

STANLEY YI ZHENG

**CRIMINAL COMPLAINT**

Case Number:  1:26-MJ-0311

**UNDER SEAL**

I, the undersigned complainant depose and say under penalty of perjury that the following is true and correct to the best of my knowledge and belief. From at least in or about May 2023, until at least in or about May 2024, in the Northern District of Georgia and elsewhere, the defendant, STANLEY YI ZHENG, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with others known and unknown, to commit certain offenses against the United States, to wit:

> (i) to fraudulently and knowingly export and send from the United States, and attempt to export and send from the United States, any merchandise, article, and object contrary to any law and regulation of the United States, and receive, conceal, buy, sell, and in any manner facilitate the transportation, concealment, and sale of such merchandise, article and object, prior to exportation, knowing the same to be intended for exportation contrary to any law and regulation of the United States, in violation of 18 U.S.C. § 554; and

> (ii) to violate and to cause one or more violations of the requirements, orders, regulations, and prohibitions under the Export Control Reform Act, in violation of 50 U.S.C. § 4819;

all in violation of Title 18, United States Code, Section(s) 371.

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.   Yes

/s/ William P. Bookout

Signature of Complainant
William P. Bookout

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to me by telephone pursuant to Federal Rule of Criminal Procedure 4.1.

March 20, 2026
Date

at   Atlanta, Georgia
City and State

J. ELIZABETH MCBATH
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

Signature of Judicial Officer

AUSA Samir Kaushal / 2024R00302

ATTEST: A TRUE COPY
CERTIFIED THIS

Date: Mar 20 2026

KEVIN P. WEIMER, Clerk

By: s/ Neethu Varghese
Deputy Clerk

## <u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT</u>

I, William P. Bookout, hereby depose and state under penalty of perjury as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.     I make this affidavit in support of criminal complaints alleging that **Stanley Yi Zheng**, **Tommy Shad English**, and **Matthew Kelly** have violated 18 U.S.C. § 371 (Conspiracy to commit offense or defraud the United States), by conspiring to commit violations of 18 U.S.C. § 554 (Smuggling Goods from the United States) and 50 U.S.C. §§ 4801 through 4852 (Export Control Reform Act of 2018).

2.     I am a Special Agent with the United States Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), Office of Export Enforcement ("OEE"), and have been so employed since October 1, 2016. I have received Criminal Investigator training at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. Prior to becoming a BIS Special Agent, I was employed as a duly Sworn Law Enforcement Officer with Douglasville Police Department as well as an Intelligence Analyst with the Georgia Counter Drug Task Force, and assigned to the Atlanta High Intensity Drug Trafficking Area Task Force, among other local law enforcement drug task forces.

3.     The OEE is an office within BIS that, among its other duties, protects national security, foreign policy, and economic interests by investigating violations of export control laws, including the Export Administration Regulations ("EAR"). As part of my duties as a federal agent, I am empowered by law to investigate and make arrests for offenses involving the unlawful export of goods and technology to destinations

outside the United States. At OEE, I work investigations involving the illegal transfer of commodities, technologies, information, and services from the U.S. I have gained experience in the conduct of such investigations through formal and informal training, relevant case work, and through consultation with other members of the U.S. federal law enforcement community.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter.

## BACKGROUND ON EXPORT CONTROL LAWS

### The Export Control Reform Act of 2018

5.      It is illegal to export or reexport dual-use items (i.e., items with civilian and military, terrorism, weapons of mass destruction, or law-enforcement-related applications) outside the United States if an export license from the DOC is required and is not obtained. Under the Export Control Reform Act of 2018 ("ECRA"), set forth at Title 50, United States Code, Sections 4801–4852, it is unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under ECRA. 50 U.S.C. § 4819(a)(1).

6.      Under ECRA, the DOC reviews and controls the export and reexport of certain items, including commodities, software, and technology, from the United States to foreign countries through the EAR, 15 C.F.R. §§ 730–774. In particular, the EAR restricts the export of items that could contribute to the military potential of other nations or that could be detrimental to United States foreign policy or national security. The EAR

imposes licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another. "Export" is defined in the EAR as an "actual shipment or transmission out of the United States." 15 C.F.R. § 734.13(a)(1). An export from the United States that transits through one country on its way to a final destination in a second country is deemed to be an export to the second country. 15 C.F.R. § 734.13(c).

7.    BIS amended the EAR in October 2022 to implement new controls on advanced computing integrated circuits ("ICs"), computer commodities that contain ICs, and certain semiconductor manufacturing items, including certain COMPANY-2-manufactured GPUs, such as the H100. *See* 87 Fed. Reg. 62186 (Oct. 7, 2022). The purpose of the new controls was "to protect U.S. national security and foreign policy interests by restricting the [People's Republic of China's] access to advanced computing for its military modernization, including nuclear weapons development, facilitation of advanced intelligence collection and analysis, and for surveillance."

8.    The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), 15 C.F.R. § 774, Supp. No. 1, and are categorized by an Export Control Classification Number ("ECCN"), each of which has export control requirements depending on the destination, end use, and end user.

9.    COMPANY-1 servers containing COMPANY-2 H100 GPU's were, as of October 2022, controlled on the CCL under ECCN 4A090.a, requiring a license for export to China.

10.    Under 50 U.S.C. § 4819(a)(1), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this part or of any

regulation, order, license, or other authorization issued under this part, including any of the unlawful acts described in paragraph (2)." Such unlawful acts include that "[n]o person may conspire or act in concert with one or more other persons in any manner or for any purpose to bring about or to do any act that constitutes a violation of this subchapter, the [EAR], or any order, license or authorization issued thereunder" and "[n]o person may order, buy, remove, conceal, store, use, sell, loan, dispose of, transfer, transport, finance, forward, or otherwise service, in whole or in part, or conduct negotiations to facilitate such activities for, any item exported or to be exported from the United States, or that is otherwise subject to the [EAR], with knowledge that a violation of this part, the [EAR], or any order, license or authorization issued thereunder, has occurred, is about to occur, or is intended to occur in connection with the item unless valid authorization is obtained therefor." 50 U.S.C. § 4819(a)(2). A person who willfully commits, willfully attempts to commit, willfully conspires to commit, or aids and abets these offenses is guilty of a federal crime punishable up to a $1,000,000 fine and 20 years' imprisonment. 50 U.S.C. § 4819(b).

### Smuggling Goods from the United States

11.     Under 18 U.S.C. § 554, it is unlawful to fraudulently or knowingly export or attempt to export from the United States any merchandise, article, or object contrary to any law or regulation of the United States, or to fraudulently or knowingly receive, conceal, buy, or in any manner facilitate the transportation, concealment, or sale of such merchandise, article, or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States.

## PROBABLE CAUSE

### *Relevant Individuals and Entities*

12.     According to Georgia Secretary of State records, **Tommy Shad English** is the CEO and registered agent of ENGLISH COMPANY, a Georgia-based company established in December 2012. **English** uses the email address shadenglish@[ENGLISH COMPANY].com.

13.     ENGLISH COMPANY's website, described the business as follows:

> [ENGLISH COMPANY] was founded in 2012 in response to growing demand and has become a leading Distributor, Aggregator, Fulfillment, VAR, and Service Provider of innovative solutions, services, IT equipment and Consumer Electronic devices. Our technology independence, combined with a growing broad ecosystem of more than 80 partners and leading technology talent, positions us to deliver maximum value to our clients across their entire technology investments. We service a large & dynamic group of clients including Fortune 500 Corporations, OEM/ODM's, Carriers, MVNO's, Gov, Edu, Retail Chains, Healthcare, Modern Workplace and Consumers for your truly one-stop shop.

> Our team is focused on the success of our valued clients and partners we have earned an industry leading reputation of trust and integrity. Big or small we provide all our clients with the same unparalleled levels of service, tailored to meet your specific market dynamics.

> We pride ourselves on building strong partner relationships with the industry's most renowned companies, ensuring we always provide our clients with first-to-market technology and award-winning solutions. Through collaborations we are able to utilise skills and knowledge to ensure our tailor-made solutions are at the highest level.

> We service and have locations globally and are group by below regions: Americas (North America, South America, Central America, Caribbean) Asia Pacific (Central & South Asia, Northeastern Asia, Southeastern Asia, Australia and Oceania) Europe (Northern Europe, Southern Europe,

Eastern Europe, Western Europe) Middle East/Africa (Middle East, Northern Africa, Southern Africa)

14.     **Matthew Kelly** operates and, according to New York Department of State Divisions of Corporations, is the registered agent of KELLY COMPANY, a New York-based company established in January 2016. **Kelly** uses the email address matthew@[KELLY COMPANY].

15.     According to the KELLY COMPANY website, the company described itself as follows:

> Since 2015, [KELLY COMPANY] has been providing system integrations support to companies globally and strategic guidance to international startups navigating the US market with tailored consulting and Go-To-Market strategies for products and services, including Mobile, IoT, Consumer Electronics, SaaS, Gen AI, Web3, Crypto, GPU/HPC, Drones and Robotics.

The website also appears to state that the business has operations in the United States, Thailand, and Hong Kong.

16.     **Stanley Zheng** operates ZHENG COMPANY, a China-based company. **Zheng** uses the email account szheng@[ZHENG COMPANY].com. According to Hong Kong Incorporation Registry documents, ZHENG COMPANY was first registered in October 2023 and the company named **Stanley Yi Zheng** as the Director in November 2023. **Zheng** also uses the email addresses szheng@[ZHENG COMPANY-2].com and stanley@[KELLY COMPANY].

a.  Based on a public internet records lookup of [ZHENG COMPANY].com website, I learned that the email for [ZHENG COMPANY].com is provisioned by Alibaba's cloud computing service, Aliyun. Alibaba is a Chinese technology company.

    b.  Based on public internet records lookup of [ZHENG COMPANY-2].com, I learned that the email for [ZHENG COMPANY-2].com is provisioned by zmail300.cn. I conducted an internet search for zmail300.cn and learned that it is a Chinese email provider. According to the ZHENG COMPANY-2 website, ZHENG COMPANY-2 is a business that supposedly offers electronics that use sensors and wireless technology to help people achieve their fitness goals. The website states that the company has offices in New York, Hong Kong, Beijing, and Shenzhen.

17.    COMPANY-1 is a computer hardware and services company that is based in San Jose, California. Some of COMPANY-1's server products use computer chips manufactured by COMPANY-2.

18.    COMPANY-2 is a computer chip company based in Santa Clara, California. COMPANY-2 is known for its powerful graphic processor units ("GPUs"). These GPUs can serve a variety of computing purposes, including artificial intelligence.

### *The Tip About Shipments to China*

19.     On or about January 31, 2024, BIS received a tip through an email account listed on the BIS website for reporting suspected violations of export laws or regulations. BIS and FBI attempted to corroborate the information provided by the tip and ultimately found the parties identified in the tip to be real companies in the line of business described in the tip. BIS and FBI did not, however, find exports related to the tip and attempted to contact the tipster directly. The phone number provided was not active. The tipster, who replied only by email, advised that he knew about the transaction he reported because he was involved but was no longer participating and that he must be careful. Because the true identity of the tipster was not discovered and it appears that the person resides overseas (the email address that the tipster used appears to be provisioned by a server in Asia), I was unable to determine if the individual has criminal history. This said, as described below, efforts were made to corroborate the tip.

20.     The substance of the tip was that ENGLISH COMPANY was participating or attempting to participate in the transshipment of export-controlled commodities, computer parts offered for sale by COMPANY-1, to China. The computer parts would require a license to export to China and, according to the tip, the computer parts were being shipped to an intermediary country, Thailand (where no license would be needed), and then making their way to China. The tipster provided the BIS with screenshots of purported emails that showed the following:

   a.   On December 12, 2023, **Stanley Zheng** <szheng@[ZHENG COMPANY-2].com> purportedly sent an email to an unknown email address in which

payment terms were described and **Zheng** states "Hi Shad, . . . I am

sending out an email connecting the Thai company and you."



b.  On December 29, 2023, **Stanley Zheng** <szheng@[ZHENG

COMPANY].com> purportedly sent an email to an unknown email

address attaching a purchase order, entitled "Purchase Order_[ENGLISH

COMPANY]_H100_20231229.docx," for $61,788,560 worth of

COMPANY-1 computer parts (232 GPU servers) to be delivered to Hong

Kong. The purchase order listed ZHENG COMPANY as the purchaser

and the order is addressed to ENGLISH COMPANY.





c. On January 6, 2024, Matthew <matthew@[KELLY COMPANY]>

purportedly sent an email to an unknown email address providing an

address in Thailand and asking "@szheng" to confirm certain information.



d. On January 12, 2024, **Shad English** <shadenglish@[ENGLISH COMPANY].com> purportedly sent an email to an unknown email address asking: "What is your logistic warehouse in Thailand address?" An email below this email (this appears to be part of an email thread) is from EastSalesSupport <EastSalesSupport@[COMPANY-3].com> and asks "Shad" for the "Incoterm [International Commercial Terms] for this request below."



***The Attempted Purchase of Export-Controlled Items
purportedly on behalf of COMPANY-4***

21. Based on the tip, the BIS contacted COMPANY-1, COMPANY-2, and COMPANY-3 (a Georgia-based logistics company) and obtained records pertaining to **English**, including emails.

22. On October 10, 2024, a United States Magistrate Judge in the Northern District of Georgia issued search warrants for email accounts shadenglish@[ENGLISH COMPANY].com, matthew@[KELLY COMPANY], and stanley@[KELLY COMPANY].

23.     According to an October 27, 2023, purchase order (the "October 2023 purchase order") obtained from COMPANY-1, ENGLISH COMPANY ordered 750 COMPANY-1 GPU Servers, totaling over $170,000,000. Of the 750 GPU Servers ordered, 600 were for servers that contained COMPANY-2's H100 GPU. The other 150 servers included other GPUs. **English** provided shadenglish@[ENGLISH COMPANY].com as a contact email and used that email address to email the purchase order to COMPANY-1.[1]

24.     On November 29, 2023, shadenglish@[ENGLISH COMPANY].com emailed COMPANY-1 an attachment for a purchase order stating that the units from the October 2023 purchase order were being exported to a Thailand-based telecom and technology company, COMPANY-4.

25.     The COMPANY-1 servers containing COMPANY-2 H100 GPU's ordered in the October 2023 order were controlled on the CCL under ECCN 4A090.a, requiring a license for export to China.

26.     On December 18, 2023, shadenglish@[ENGLISH COMPANY].com emailed COMPANY-1 a signed "Advanced Computing Certification," certifying that the COMPANY-2 H100 GPUs were not destined for China or any other country subject to heightened export requirements.

27.     On December 18, 2023, shadenglish@[ENGLISH COMPANY].com emailed COMPANY-1 a signed "Certification of Headquarters Location" certifying that

---

[1] The purchase order stated that ENGLISH COMPANY's mailing address was an address in Atlanta, GA. This address is for a UPS Store. According to information obtained from the UPS Store, English has a mailbox at the location.

"the current headquarters location of the Company identified in the signature block, and each of its parents, is NOT any of the countries identified above in the Background section." COMPANY-4 in Bangkok, Thailand, was the company displayed in the signature block and the countries identified in the Background section included China. With this certification, **English** attested that the end user was not located in China.

28.    On January 9, 2024, the Georgia-based logistics company **English** was using for shipment, COMPANY-3,[2] emailed shadenglish@[ENGLISH COMPANY].com asking for clarification on payment information. **English** responded to the email by adding matthew@[KELLY COMPANY] and szheng@[ZHENG COMPANY-2].com as carbon copy recipients and replying, "Matt or Stan will have to answer this."

29.    On January 25, 2024, shadenglish@[ENGLISH COMPANY].com emailed COMPANY-1 to discuss upcoming compliance reviews for the October 2023 purchase order and asked COMPANY-1 to add a Gmail email address, szheng@[ZHENG COMPANY].com, and matthew@[KELLY COMPANY] as carbon copy recipients.

30.    On January 26, 2024, COMPANY-1, in response to **English's** email from the day before, added a Gmail email address, szheng@[ZHENG COMPANY].com, and matthew@[KELLY COMPANY] as carbon copy recipients and stated that the company was concerned that the computer parts from the October 2023 purchase order would end up in China. The email noted that:

---

[2] BIS obtained this email from COMPANY-3. Notably, the tipster sent a screenshot of an email purporting to show correspondence involving shadenglish@[ENGLISH COMPANY].com and an email address associated with the domain name for COMPANY-3.

a. "[COMPANY-1] finds it odd that no one from [COMPANY-4]" was in the list of carbon copy recipients.

b. "[ZHENG COMPANY] is based in China[.]";

c. The reliance on a Gmail address added to the security concerns.

d. "China is an embargoed country restricted by the US government. US companies are restricted from selling to businesses or end users headquartered in China."

The email also asked for contact information for the purported end user, COMPANY-4.

31. Because COMPANY-2 computer chips were needed for the October 2023 purchase order, COMPANY-2 also became involved in the vetting of the proposed transaction. According to emails obtained from COMPANY-2, attempts by COMPANY-2 to confirm that ENGLISH COMPANY was purchasing products on behalf of COMPANY-4 were unsuccessful.

32. In an email thread titled "Re: [COMPANY-4] Thailand Opportunity through [ENGLISH COMPANY]?" dated February 2 through February 8, 2024, COMPANY-2 employees discussed concerns with the legitimacy of the transaction.

33. On February 6, 2024, a COMPANY-2 employee stationed in Thailand emailed other COMPANY-2 employees, stating that COMPANY-4 and a related company were "not aware of this project" and that it "[l]ook[ed] like something [was] amiss here with all these very large shipment of GPUs."

34. On February 8, 2024, a COMPANY-2 employee replied to the above email and stated that (i) an email address that was provided by ENGLISH COMPANY as the email address for the COMPANY-4 point-of-contact bounced back when emailed,

(ii) ENGLISH COMPANY itself was a "suspicious entity," and (iii) the deal would definitely not be moving forward.

35.    According to COMPANY-1, the company placed the ENGLISH COMPANY order on hold and, on or about April 11, 2024, refunded the partial payment that had been made by ENGLISH COMPANY.

### *The Attempted Purchase of Export-Controlled Items purportedly on behalf of COMPANY-5*

36.    On April 2, 2024, **English** requested from COMPANY-1 500 COMPANY-2 H100 GPUs for export to a Thailand-based company, COMPANY-5.

37.    On April 19, 2024, shadenglish@[ENGLISH COMPANY].com emailed COMPANY-1 an End User Certification stating that COMPANY-5 is the end user for the purchase.

### *The Introduction of KELLY COMPANY as purported representative for COMPANY-4*

38.    On June 11, 2024, matthew@[KELLY COMPANY] emailed COMPANY-1 and shadenglish@[ENGLISH COMPANY].com, carbon copying stanley@[KELLY COMPANY], and attached a letter, purportedly from COMPANY-4, stating that COMPANY-4 was now relying on KELLY COMPANY to handle its business with COMPANY-1. In reality, as shown in the text messages described below, **Zheng**, **Kelly**, and **English** were in fact acting together at least by May 31, 2023.

### *ENGLISH COMPANY's Bank Account at Chase Bank*

39.    On or about June 9, 2023, **English** opened a business bank account for ENGLISH COMPANY at Chase Bank.

40.    From account opening in June 2023 until approximately December 13, 2023, there is almost no banking activity. In December 2023, the bank account became more active:

   a. On or about December 13, 18, and 20, 2023, the account received deposits totaling $4,043,655, from a bank account at the Industrial and Commercial Bank of China in Bangkok, Thailand. The bank records indicate that the funds were sent by COMPANY-6 for "Import Goods." There were no other deposits into the account.

   b. On or about December 18, 2023, $3,000,000 was wired to COMPANY-1. This payment appears to be partial payment for the October 2023 purchase order.

   c. On or about December 22, 2023, $850,000 was wired to COMPANY-1. This payment appears to be partial payment for the October 2023 purchase order.

   d. In December 2023, a variety of purchases were made using the bank account, including restaurants, gym membership, and a $5,662.80 purchase at a luxury jewelry store.

41.    In January 2024, the bank account received three additional deposits totaling approximately $22.9 million from the same Commercial Bank of China account in the name of COMPANY-6.

42.    On or about January 5, 2024, the Chase account wired $2,462,763 to COMPANY-1 as partial payment for the October 2023 purchase order.

43.    On or about January 26, 2024, the Chase account wired $18,938,290 to COMPANY-1 as partial payment for the October 2023 purchase order.

### *COMPANY-6*

44.    An email from shadenglish@[ENGLISH COMPANY].com to szheng@[ZHENG COMPANY 2].com, [COMPANY-6]3133@gmail.com, and matthew@[KELLY COMPANY], on December 12, 2023, attached a sales invoice on ENGLISH COMPANY letterhead, dated December 12, 2023, bearing Order Number 8700033178 and PO ("Purchase Order") Number ITGN 2023 1, including the aforementioned sale of COMPANY-1 servers. The "Bill To" recipient is listed as COMPANY-6 to the attention of "Amnart" at email address [COMPANY-6]3133@gmail.com.

45.    An email thread between [COMPANY-6]3133@gmail.com and shadenglish@[ENGLISH COMPANY].com, cc'ing svzheng@[ZHENG COMPANY 2].com and matthew@[KELLY COMPANY], dated December 12 through 14, 2023, includes discussion and screenshot confirmations (in what appear to be Chinese) of two of the international wire transfers, mentioned above, in the amounts of $198,975 and $2,992,540 that were sent from COMPANY-6 to ENGLISH COMPANY.

46.    An email from shadenglish@[ENGLISH COMPANY].com to szheng@[ZHENG COMPANY].com, on April 25, 2024, attached a "Credit Note," dated April 25, 2024, also on [ENGLISH COMPANY] letterhead, and bearing the same Order Number 8700033178. The Credit Note lists the aforementioned sale of COMPANY-1

servers. As with the sale invoices, the Credit Note lists the recipient as COMPANY-6, to the attention of "Amnart" at email address [COMPANY-6]3133@gmail.com. On April 26, 2024, szheng@[ZHENG COMPANY].com replied to shadenglish@[ENGLISH COMPANY].com, attaching the same document, and stating "Hi Shad, It looks good. Please email it to [COMPANY-6]. Thank you, Stanley". On April 26, 2024, shadenglish@[ENGLISH COMPANY].com emailed [COMPANY-6]3133@gmail.com and attached the same document with szheng@[ZHENG COMPANY].com in the Bcc line. The document lists the six international wire transfers into the Chase bank account between December 18, 2023, and January 25, 2024, totaling $26,958,050.

47.    On April 24, 2024, I visited the website for COMPANY-6. The "About the company" page states that the company was established in 2021 and that "it is mainly engaged in the sales of smart devices, robots, artificial intelligence, servers and other products, and provides customers with professional services and products." Based on my review of the website, there is no information about a relationship with ENGLISH COMPANY, and I did not see any connection between COMPANY-6 and COMPANY-4 in Thailand, the company that **English** claimed was the purchaser in the October 2023 purchase order.

48.    On April 25, 2024, I searched the Automated Export System database for COMPANY-6 and did not find any past reported exports.

49.    On April 29, 2024, [COMPANY-6]3133@gmail.com sent an email to shadenglish@[ENGLISH COMPANY].com, szheng@[ZHENG COMPANY].com, and matthew@[KELLY COMPANY], acknowledging receipt of the "credit note" and

requesting a refund of $1,000,000 by April 29, 2024, and the remaining $25,958,050 by May 6, 2024, to the COMPANY-6 business account.

### *The Border Search of Kelly's Phone*

50.     On February 13, 2026, **Kelly** was returning to the United States from Rome, Italy via an international flight. At the Newark International Airport, **Kelly** was encountered at the border as he applied for admission into the United States. Customs and Border Protection and Homeland Security Investigations ("HSI") conducted an inspection and travel related interview. HSI detained **Kelly's** laptop and cellular phone as part of a border search. These electronics were sent to the HSI Atlanta Office for review. During this review, HSI Atlanta sought assistance from BIS, FBI, and the Defense Criminal Investigative Service.

51.     **Kelly's** phone contained numerous messages showing that **English**, **Zheng**, and **Kelly** were seeking to obtain COMPANY-1 and COMPANY-2 products and ship them to the ultimate destination of China via Thailand, in contravention of United States laws.

52.     For instance, in the messaging application WhatsApp Business, a group chat named "GPU Partnership" between users "*Shad" (**English**) "Stanley" (**Zheng**), and "You" (**Kelly**) was created on May 31, 2023, by **Kelly**. **Kelly** began the group chat by explaining to **English** that there is a customer seeking COMPANY-2 A100, H100, and A800 units.



53.     On June 6, 2023, in the group chat, **Zheng** asks for an update on a quote. **English** replies that the deal is being worked but that the GPUs are "[h]ighly restricted." **English** goes on to clarify: "these Data Center models are restricted and very hard to get." **English** describes the A800 as "a china spec model" and states: "Only thing i ask is

nothing illegally is going on and ill want that in writing." **English's** actions, as shown

below, did not line up with these words.



54. On June 27, 2023, in the group chat, **Kelly** states: "They just need more details about your company, customers, revenue, etc." and "I know you mention you [**English**] are better than CDW but they have a nice website, company decks, quarterly earning reports, etc that are all public information." **English** replies: "I'm not breaking my back. I fake these weeks ago."



55.    On June 28, 2023, in the group chat, **Zheng** asks: "Can you [**English**] receive funds from HSBC in Hong Kong?" **English** replies: "As of now I do not see why not. We might need to reffrence a different po # or something. Call it Samsung or something. But I think be fine."



56. On July 2, 2023, in the group chat, **Zheng** sends a message discussing the market value of COMPANY-2 A100, A800, and H100 chips in China, showing that **Zheng**, **English**, and **Kelly** were all aware that the ultimate destination for the chips would be China.



57.     On January 25, 2024, in the group chat, **Kelly** tells **English** that the "final wire" for the "1st order" should "hit" his bank account "today/tomorrow." **English** responds affirmatively and, on January 29, 2024, provides an update on COMPANY-1 shipping documents. The timing of **Kelly's** message about the final wire for the first order matches up with the January 2024 payments from COMPANY-6 to ENGLISH COMPANY's Chase Bank account. There was a payment from COMPANY-6 on January 25, 2024, in the amount of $8,870,715. Money that went into ENGLISH COMPANY's Chase Bank account was used to pay for the October 2023 purchase order.



58. On February 1, 2024, in the group chat, **Zheng** sends a message asking that someone forward the "packing list" to a contact in Thailand at COMPANY-7. COMPANY-7 is, according to a February 8, 2024, email from a COMPANY-2 employee, the same company that ENGLISH COMPANY told COMPANY-1 would be the logistics company for the chip shipment. In discussing the forwarding of the packing list, **Zheng** states: "I do not want to forward it using my email address. Just in case that [COMPANY-7] somehow forward the email back to [COMPANY-1] with my email address. Please do not cc me." **English** replies: "Im still up. I can do it. Just the packing list or that last email I sent and packing list."

59. On February 19, 2024, in the group chat, **Kelly** stated: "@*Shad – as feared [COMPANY-2] is calling [COMPANY-4] directly still and now contacting their competitor division who is saying the Dr is shipping these units to China. This call needs to be done today or it's over." **English** states: "Hang on. Let me look into this." And **Kelly** replies: "Call today please [o]r it's over since they are putting everything in doubt with more time."



60.    On February 20, 2024, in the group chat, **Zheng**, **English**, and **Kelly**

discuss the possibility of a "Dr." participating in a call. Based on interviews with

employees of COMPANY-2, I know that a particular individual who used the title "Dr."

was identified as a representative of COMPANY-4 who was supposed to speak with

COMPANY-2 and COMPANY-1 about the COMPANY-4 purchase order.



61.     On February 22, 2024, in the group chat, **Zheng** states that the Dr. does

not want to be on a call and needs to be set at ease by **English**. Specifically, **Zheng** asks

**English** to speak with the Dr. "and share with him what's going on with [COMPANY-1]

and [COMPANY-2], [and] make[] him feel comfortable first." **Kelly** asks whether

**English** can speak with the Dr. today and **Zheng** states: "It is up to him. We should not

push him. Otherwise, he may decide to stop the deal for good. This causes too much risk

for him, which he feels that it is unexpected." As mentioned above, according to

employees of COMPANY-2, while trying to convince COMPANY-1 and COMPANY-2

to complete the deal with COMPANY-4, **English** offered to connect the companies with

the Dr., who was held out as an employee of COMPANY-4.



62.    On February 22, 2024, in the group chat, **English** discusses proposed

answers to questions posed by COMPANY-1. One of the proposed responses is that

**English** tell COMPANY-1 that the products being ordered would stay in Thailand and

not enter an embargoed country.



63.     On February 22, 2024, in the group chat, **Kelly** lamented that the manner

in which information was conveyed to COMPANY-1 ended up "look[ing] suspicious,"

and then stated: "We just need to know the questions [COMPANY-2] needs to know for

compliance to release the order. That's it. Nothing else. No other questions."

Page 30 of 38



64.      On March 7, 2024, **Kelly** separately messaged **Zheng** on WeChat with a

message that appears to have been sent for workshopping purposes. The message appears

to be a draft solicitation message for **Kelly** to send to others. The message states, among

other things: "[I am] [c]urrently working on distributing GPU systems with

[COMPANY-2] chips for supercomputing[.] . . . We . . . have a few customers in China

but it's a banned country for distribution. It's a lucrative business right now – millions of dollars in profits per order – so we are looking for partners. One you can find customers that need GPUs for their supercomputer solutions or two they act as a pass through partner for customers in China. Let me know if you are interested in discussing?"



65.    Approximately 28 minutes after sending the draft solicitation message to **Zheng**, **Kelly** received feedback from **Zheng** via WeChat. **Zheng** states, among other things: "DO NOT MENTION ANYTHING ABOUT CHINA. Please drop those lines: We also have a few customers in China but it's a banned country for distribution. two they act as a pass through partner for customers in China." **Zheng** explained that these

portions of **Kelly's** message needed to be removed because: "We will draw attention[] from US government for embargo[] violation." In response, **Kelly** notes that similar information had been told to other individuals. **Zheng** replies: "We just talk about it, no one can hold it as evidence[] against us."



66.    On March 21, 2024, in the group chat, **Kelly** asks for an update on COMPANY-1 and **English** says that there are no canceled orders but there are "[l]ots of moving parts to this mess to try to get it sorted without more massive red flags." In response, **Kelly** indicates that they may have to return "the money" early the following week. Based on the timeline and the overall subject matter of this group chat, I believe

that "the money" being referred to is the money that COMPANY-6 sent to ENGLISH

COMPANY'S Chase Bank account.



67.    On March 24, 2024, in the group chat, **Kelly** asks for an update on

"compliance questions from [COMPANY-2]" and **English** provides feedback.



68.     On April 23, 2024, in the group chat, **Kelly** refers to the COMPANY-5

deal, stating: "Let's finish the [COMPANY-5] shipment first. [COMPANY-2] did not

meddle with this deal unlike what they did with [COMPANY-4]." In response, **English** sends a link to an article about how China acquired recently banned [COMPANY-2] chips and stated: "Saw this today in stock feeds. Probably why [COMPANY-2] etc is concerned, as I'm sure you know."



69.    On May 29, 2024, in the group chat, **Kelly** complains to **English** that "[n]ow [COMPANY-6] has me involved because you [**English**] are a red flag." **English** replied: "Not true at all" and noted that COMPANY-1 asked about **Kelly** and Russia and Stan's (**Zheng**) "email in China." **English** explained that he "had it under[] control" and he "told Stan this many times."



70.     The above-described text messages, I believe, show that **Zheng**, **English**, and **Kelly** were seeking to obtain export-controlled COMPANY-2 chips from COMPANY-1 and COMPANY-2 through fake deals with COMPANY-4 and COMPANY-5 and have those chips ultimately shipped to China in contravention of United States law.

71.     I confirmed with DOC that **Zheng**, **English**, and **Kelly** did not apply for—or receive—a license to export the COMPANY-2 chips to China.

### *Conclusion*

72.     Based on the foregoing, I respectfully submit that there is probable cause to believe that **Stanley Yi Zheng**, **Tommy Shad English**, and **Matthew Kelly** have violated 18 U.S.C. § 371 (Conspiracy to commit offense or defraud the United States), by conspiring to commit violations of 18 U.S.C. § 554 (Smuggling Goods from the United States) and 50 U.S.C. §§ 4801 through 4852 (Export Control Reform Act of 2018).